## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| EPIC TECH, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:15cv252 |
| v. | ) | |
| | ) | |
| STHR GROUP, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Defendant DDDDB, LLC's Motion to Dismiss" (Docket Entry 67) (the "DDDDB Motion"), "Defendants Falcon Technologies, LLC and Richard Schappel's Motion to Dismiss" (Docket Entry 69) (the "Falcon Technologies Motion"), and "Defendant Richard Schappel's Motion to Dismiss Cross-Claims" (Docket Entry 78) (the "Schappel Motion"). For the reasons that follow, the Court should deny the DDDDB Motion, the Falcon Technologies Motion, and the Schappel Motion (collectively, the "Motions to Dismiss").

## STATEMENT OF THE CASE

### I. Preliminary Matters

On March 23, 2015, Epic Tech, LLC ("Epic") sued STHR Group, LLC ("STHR") and Pryor Development Company, Inc. ("Pryor," and collectively with STHR, the "Store Defendants") for, <u>inter alia</u>, copyright infringement, trademark infringement, Lanham Act

violations, conversion, misappropriation of trade secrets, and unfair and deceptive trade practices in connection with their use of the "Falcon" sweepstakes system. (Docket Entry 1.) According to Epic, this "server-based, electronic sweepstakes software system" "is a pirated copy" of Epic's "Legacy" sweepstakes software. (Id. at 2, ¶ 9.)[1] In March and April 2015, United States District Judge Catherine C. Eagles granted Epic's requests for a temporary restraining order, orders of impoundment, and a preliminary injunction against the Store Defendants. (See Docket Entry 27.) Judge Eagles also granted Epic's request for limited expedited discovery to help determine other entities involved in the alleged infringements. (See Docket Entry 21 at 1; Docket Entry 27 at 4-6.) Thereafter, Epic filed an amended complaint (the "Amended Complaint") against the Store Defendants and various other entities allegedly involved in the distribution and utilization of the Falcon software. (Docket Entry 39.) The Amended Complaint likewise asserts claims for, inter alia, copyright infringement, trademark infringement, Lanham Act violations, conversion, misappropriation of trade secrets, and unfair and deceptive trade practices. (See id. at 23-35, ¶¶ 101-68.)

---

[1] Citations herein to Docket Entry pages utilize the document's internal pagination if unified internal pagination exists. In the absence of such pagination, the Docket Entry page citations utilize the CM/ECF footer's pagination.

## II.  Amended Complaint

As relevant to the Motions to Dismiss, the Amended Complaint makes the following allegations:

Epic owns Legacy, a proprietary gaming software system, and various associated copyrights, trademarks, and patents. (Docket Entry 39 at 10-18, ¶¶ 50-83; id. at 21-22, ¶ 98.) Certain of these copyrights and trademarks are federally registered. (See id. at 16-18, ¶¶ 75-76, 78, 80.) Legacy operates across a network consisting of a server, a management terminal, a point of sale terminal, and computer terminals for customers' use. (Id. at 10, ¶ 52.) It features "highly confidential mathematical formulas" and source code that neither individuals playing the Legacy games nor businesses licensing the Legacy system may view. (Id. at 11, ¶ 53.) Instead, "[a]ccess to the server is only available to high security level employees of Epic, via sophisticated password protection mechanisms." (Id.) Utilizing this code, Legacy creates a "variety of games, which have proprietary names, themes, images, sounds, and even music." (Id. at 11, ¶ 54.) "With access to and knowledge of the server-based core software, it is possible to design new games with different images or modify the images of existing games, while still relying upon the same game design and mathematical formulas contained in the core software." (Id. at 12, ¶ 56.)

3

The Store Defendants and identified "Distributor Defendants" (collectively, "Defendants") have jointly and individually violated Epic's rights by distributing Falcon, a pirated version of Legacy. (Id. at 19-23, ¶¶ 84-100.) The Store Defendants acquired Falcon, which they offer for public use at their stores, through a licensing and distribution agreement with Prestige Gaming Solutions, LLC ("Prestige"). (Id. at 19, ¶¶ 85-86.) Through a licensing and distribution agreement with Falcon Amusement, LLC ("Falcon Amusement"), Prestige and TBW Management, LLC ("TBW") distribute, install, and maintain Falcon at stores in North Carolina and Florida. (Id. at 19, ¶¶ 87-88.) Falcon Amusement in turn acquired Falcon for distribution in North Carolina and Florida through a licensing and distribution agreement purportedly with DDDDB, LLC ("DDDDB"). (Id. at 19, ¶ 89.) Falcon Technologies, LLC ("Falcon Technologies") "is the sole member/manager of DDDDB." (Id. at 5, ¶ 21.) Prestige, DDDDB, Falcon Technologies, Falcon Amusement, STHR, and TBW are alter egos of certain individual defendants. (Id. at 4-8, ¶¶ 16-42.) In particular, DDDDB and Falcon Technologies are alter egos of Richard Schappel ("Schappel," and collectively with DDDDB and Falcon Technologies, the "DDDDB Group"). (Id. at 5, ¶¶ 21-22.)

The Distributor Defendants, including DDDDB, Falcon Technologies, and Schappel, "induced, encouraged, and/or contributed to" the Store Defendants' "copyright infringing

4

activity." (Id. at 24, ¶¶ 109-10.) The Distributor Defendants also "supplied materials, including servers" to "others, including internet cafes," who infringed Epic's trademarks and committed unfair competition in contravention of the Lanham Act and common law. (Id. at 26, ¶ 117; see id. at 28, ¶¶ 128-29; id. at 30, ¶ 139.) Finally, the Defendants "have taken illegally and possessed" "the sole and exclusive property of Epic" (id. at 31, ¶¶ 143-44); have misappropriated Epic's trade secrets, including "formulas, methodologies, and other confidential information" in the Legacy software (id. at 32-33, ¶¶ 152-53, 155); and have, through these actions, committed "unfair and deceptive acts and practices" in contravention of North Carolina General Statute Section 75-1.1 (the "UDTPA") (id. at 34-35, ¶¶ 165, 168).

### III. Crossclaims

In conjunction with answering the Amended Complaint, Falcon Amusement and related individual defendants (the "Falcon Amusement Parties") brought crossclaims for breach of contract, fraud and/or misrepresentation, and unfair or deceptive trade practices (the "Crossclaims") against DDDDB and Schappel (the "Schappel Group"). (Docket Entry 73 at 16-21.) As relevant to the Motions to Dismiss, the Crossclaims assert:

Schappel approached Kevin Frank ("Frank")[2] "about a new software [Schappel] wanted to put into operation at locations in North Carolina." (Id. at 16.) After "several months" of negotiations, the Schappel Group and Falcon Amusement entered into a licensing and distribution contract for this Falcon software (the "Agreement"). (Id. at 16-17; see also Docket Entry 73-1 (Agreement).) During the negotiations, Schappel told Falcon Amusement that he and Gary Lantz ("Lantz") had created the Falcon software. (See Docket Entry 73 at 17, 19-20.) In entering into the Agreement, the Falcon Amusement Parties relied on the Schappel Group's representation that the Falcon software was Lantz and Schappel's original work. (See id. at 17, 19-20.)

The Falcon Amusement Parties had no access to the Falcon source code. (Id. at 17.) During the period the Falcon Amusement Parties used the Falcon software, Frank had multiple discussions with Schappel and Lantz regarding necessary changes to the software. (Id.) "[T]o comply with local law enforcement objections," the Schappel Group made "several changes to the software during the time that it was being operated in North Carolina." (Id.) These modifications included changes "to the math, that is both the paytable and percentage of payouts," and "to the manner in which the software operated." (Id. at 18.)

---

2  Frank is an investor in Falcon Amusement. (Docket Entry 73 at 2.)

The Agreement, which was attached to the Crossclaims, was "entered into effective as of November 18, 2014 (the 'Effective Date'), by and between DDDDB, LLC ('Manufacturer'), and Falcon Amusement, LLC[,] a North Carolina Limited Liability Company ('Licensee')" "to facilitate the distribution of the SOFTWARE in the State of NORTH CAROLINA (the 'Territory'), subject to the terms and conditions of this Agreement." (Docket Entry 73-1 at 1.) Pursuant to the Agreement, "Manufacturer hereby grants to Licensee an exclusive License of the SOFTWARE in the Territory, subject to the terms and conditions hereof" (id.), including certain placement targets (id. at 3). Specifically, the Agreement mandated that Falcon Amusement place "at least 50 terminals with the Software" in North Carolina "each quarter of the first year of this Agreement," with at least 250 such terminals "placed within the first year." (Id.) The Agreement had an initial one-year term, with automatic 24-month renewals. (Id. at 3-4.) The Agreement contained a North Carolina choice of law provision and a mandatory North Carolina forum selection clause, with corresponding consents to personal jurisdiction in North Carolina. (Id. at 7.) Each party "warrant[ed] and represent[ed] to the other . . . that the officer of each party executing this Agreement below is authorized to bind his company to this Agreement." (Id. at 6.) On November 20, 2014, Schappel signed the Agreement on behalf of DDDDB. (Id. at 7.) The Agreement does not mention Falcon Technologies. (Id.)

## IV.  Motions to Dismiss

In response to the Amended Complaint and the Crossclaims, the DDDDB Group brought the Motions to Dismiss.  Collectively, the Motions to Dismiss seek dismissal of Schappel and Falcon Technologies from the lawsuit on personal jurisdiction grounds and/or dismissal of Epic's state-law conversion, trade secret misappropriation, and UDTPA claims on copyright preemption grounds. (See Docket Entries 67, 69, 78.)  The Falcon Technologies Motion also maintains that the Amended Complaint presents insufficiently particularized allegations against Falcon Technologies and Schappel.  (Docket Entry 69 at 2.)  In support of the Falcon Technologies Motion and the Schappel Motion, Schappel filed affidavits attesting to his, and for the Falcon Technologies Motion, Falcon Technologies', lack of contacts with North Carolina. (Docket Entries 69-1, 78-1.)  Schappel attached Nevada incorporation and licensure records for Falcon Technologies and DDDDB to his affidavit in support of the Falcon Technologies Motion.  (Docket Entry 69-1 at 8-16.)

Schappel initially maintained that he acted on behalf of DDDDB in executing and implementing the Agreement.  (Docket Entry 79 at 4-6; see also Docket Entry 70 at 7 ("Schappel has no contacts with North Carolina whatsoever. . . .  Plaintiff has not and cannot show that Schappel purposefully availed himself of the State or otherwise established minimum contacts . . . .").)  In response,

8

Epic and the Falcon Amusement Parties emphasized that — according to its Nevada incorporation records — DDDDB was not incorporated until February 10, 2015, months after the Agreement's execution and implementation. (Docket Entry 80 at 4-5, 8, 15; Docket Entry 82 at 2-3, 5-8; <u>see also</u> Docket Entry 69-1 at 13-15.)  In their reply briefs, Falcon Technologies and Schappel asserted that Schappel acted on behalf of Falcon Technologies prior to DDDDB's formation. (Docket Entry 86 at 1-5, 7; <u>see generally</u> Docket Entry 87.)

## V.  Jurisdictional Evidence

As aforementioned, Schappel and Falcon Technologies offered affidavits and Nevada business records in support of their contention that the Court lacks personal jurisdiction over them. In response, Epic presented testimony from the "30(b)(6) Deposition of DDDDB, LLC, Richard A. Schappel" (Docket Entry 80-1) (the "30(b)(6) Deposition"); deposition testimony from Frank (Docket Entry 80-2) (the "Frank Deposition"); and Texas Secretary of State business organizations inquiry results for DDDDB (Docket Entry 80-3) and Falcon Technologies (Docket Entry 80-4).  Collectively, these materials reveal the following pertinent facts:[3]

In his affidavits, Schappel asserts that (1) neither he nor Falcon Technologies has any assets in North Carolina and (2) he has not "conducted business in North Carolina in [his] individual

---

[3]  The below summary only identifies sources where facts are disputed.

capacity or on behalf of Falcon Technologies." (Docket Entry 78-1 at 2-3; see also Docket Entry 69-1 at 3-5.) Instead, Schappel maintains, "[a]ny actions [he] ha[s] taken regarding the software at issue in this lawsuit were made on behalf of DDDDB, not in [his] individual capacity. Furthermore, any such actions took place in either Texas or Nevada." (Docket Entry 78-1 at 4.) Schappel has physically traveled to North Carolina one time, for a wedding twenty years ago. (Docket Entry 69-1 at 3; Docket Entry 78-1 at 2.) Schappel asserts that he has (1) never commingled his personal funds with DDDDB or Falcon Technologies nor (2) treated the assets of DDDDB or Falcon Technologies as his own. (Docket Entry 69-1 at 4; Docket Entry 78-1 at 3.) He also maintains that DDDDB and Falcon Technologies "follow all LLC formalities." (Docket Entry 69-1 at 4; Docket Entry 78-1 at 3.) According to his affidavits, Schappel is the manager of Falcon Technologies. (Docket Entry 69-1 at 4; Docket Entry 78-1 at 3.) "A. T. Mathis," however, is identified as the manager of Falcon Technologies on the articles of organization for Falcon Technologies and DDDDB. (Docket Entry 69-1 at 8, 10, 14.)

Schappel is the sole member of Falcon Technologies. (Docket Entry 80-1 at 32.) Schappel created Falcon Technologies in 2013 to distribute Falcon software, "but it solely distributed Falcon

10

through DDDDB." (Id. at 12; see id. at 30, 45, 76.)[4] Schappel decided to create a wholly owned subsidiary of Falcon Technologies to "distribute[] the Falcon software to Falcon Amusement[]." (Id. at 32; see id. at 12, 45.) Schappel created DDDDB for this purpose. (Id. at 12, 32, 45; see also id. at 30-31.) Although "DDDDB was a pass-through" (id. at 33), as of April 2015, Frank had never heard of Falcon Technologies (Docket Entry 80-2 at 56). Franks maintains that Schappel approached him about the Falcon software around April of 2014. (Id. at 43.) Schappel denies approaching Frank "about distributing software in North Carolina." (Docket Entry 78-1 at 3.) Schappel further denies "enter[ing] into an agreement to distribute software in North Carolina. Rather, the agreement to distribute software was between DDDDB and Falcon Amusement." (Id.)

Schappel is solely responsible for the management of DDDDB, including its accounting needs, records, contracts, and invoices. (Docket Entry 80-1 at 32-33, 40.) If Falcon Amusement needed technical support with the Falcon software, Frank would call Schappel, who "would call a guy named Frank Lara" ("Lara") and tell him "we're having this problem at this location, can you guys take a look at it." (Id. at 37.) On roughly a weekly basis, Schappel accessed the distributed Falcon servers through the "LogMeIn"

---

4    As Schappel explained, "Falcon [Technologies] never distributed [Falcon software]. DDDDB was the only way that I ever distributed it." (Docket Entry 80-1 at 12.)

remote access system to calculate DDDDB's share of the profits from each server under the Agreement. (See id. at 40-43, 64-66.) Schappel typically named the servers in the LogMeIn system according to their locations. (Id. at 42.) Schappel mandated that these locations be at least two miles apart. (Id. at 68-69.)

The Falcon software distribution process was: (1) Falcon Amusement informed Schappel of the name and address of a store needing a Falcon system; (2) Schappel created a server containing the Falcon software from his master copy; (3) Schappel mailed the server to Falcon Amusement[5] or, occasionally, a store; (4) Falcon Amusement installed the server and associated terminals at the store; (5) Falcon Amusement notified Schappel upon installation of the Falcon system; and (6) Schappel contacted Lara to activate the server, which likely occurred through the LogMeIn system. (Docket Entry 80-1 at 43, 49-58.) Between November 2014 and March 2015, the public used the Falcon servers in at least 11 locations in North Carolina. (See id. at 147-56.) Schappel does not know whether the DDDDB Group or Falcon Amusement owns these servers, but Schappel paid for the servers and did not charge Falcon Amusement for them. (Id. at 58-59.)

Falcon Technologies and DDDDB are registered in Nevada, but DDDDB never conducted business there. (Docket Entry 80-1 at 31;

---

5  The Agreement lists a Hickory, North Carolina address for Falcon Amusement. (See Docket Entry 73-1 at 7.)

see Docket Entry 69-1 at 8-16.)  Neither Falcon Technologies nor DDDDB is licensed to transact business in Texas.  (Docket Entries 80-3, 80-4.)  The Nevada office address listed for DDDDB on its articles of organization and in the Agreement is solely for incorporation purposes.  (Docket Entry 80-1 at 31.)  DDDDB's office address is 2009 RR 620 North, Suite 150, Austin, Texas 78734.  (Id. at 10.)  Using the "ISWEEPSTAKES" name, Schappel mailed at least one server from this address to "Reel Adventures" (a store utilizing Falcon software) in Archdale, North Carolina.  (See Docket Entry 80-2 at 27-28, 119; see also Docket Entry 80-1 at 149, 151, 153-54, 156.)  Falcon Amusement sent DDDDB's share of the Falcon profits in checks made payable to DDDDB to a post office box in Austin, Texas.  (See Docket Entry 80-1 at 22, 155.)  Invoicing and payments under the Agreement began around December 3, 2014.  (See id. at 155-56).  Schappel received profits for Falcon systems in North Carolina prior to DDDDB's incorporation.  (See id. at 149-56; see also id. at 12, 45-46.)

Schappel maintains that "[i]t would be extremely inconvenient and burdensome for [him] to have to defend this lawsuit in North Carolina.  In particular, it would be extremely costly for [him] to maintain this action in North Carolina, as compared to Texas where [he] live[s]."  (Docket Entry 69-1 at 5; Docket Entry 78-1 at 4.)  The DDDDB Group has, however, the same counsel (see, e.g., Docket Entries 50, 60), and Schappel and Falcon Technologies relied on

13

DDDDB's briefing in support of the Falcon Technologies Motion (Docket Entry 86 at 9 ("The Movants incorporate by reference all arguments made in the Reply Brief in Support of DDDDB's Motion to Dismiss that is being filed substantially contemporaneously herewith, but do not duplicate them here.")).

## DISCUSSION

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Rules"), DDDDB seeks dismissal of Epic's North Carolina conversion, trade secret misappropriation, and UDTPA claims based on Copyright Act preemption. (Docket Entry 67 at 1.) Falcon Technologies and Schappel echo this contention and further request dismissal of all claims under Rule 12(b)(6) on the grounds that the Amended Complaint lacks particularized allegations against them. (Docket Entry 69 at 2.) In addition, Falcon Technologies and Schappel seek dismissal under Rule 12(b)(2) on the basis that (1) they have insufficient contacts with North Carolina and (2) Schappel is not "the alter ego of either Falcon Technologies or DDDDB." (Id. at 1-2.) Schappel makes the same Rule 12(b)(2) arguments for dismissal of the Crossclaims. (Docket Entry 78 at 1-2.) The undersigned will analyze the Rule 12(b)(2) contentions before considering the Rule 12(b)(6) assertions.

## I.  Jurisdiction Challenge

In response to a defendant's Rule 12(b)(2) personal jurisdiction challenge, the plaintiff must ultimately prove the

14

existence of personal jurisdiction by a preponderance of the evidence. Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 396 (4th Cir. 2003). If a court considers a pretrial personal jurisdiction challenge without conducting an evidentiary hearing, however, the plaintiff need only "mak[e] a prima facie showing in support of its assertion of jurisdiction." Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558 (4th Cir. 2014), cert. denied, ___ U.S. ___, 135 S. Ct. 2860 (2015). In such circumstances, the court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Id. (quoting Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)). In so doing, the court must construe all "conflicting facts in the parties' affidavits and declarations in the light most favorable to [the plaintiff]." Id. at 560.

The Court may exercise jurisdiction over Schappel and Falcon Technologies if (1) North Carolina's long-arm statute authorizes it and (2) the exercise of jurisdiction comports with due process under the Fourteenth Amendment. Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001) [hereinafter, "Christian Sci."]. As the Fourth Circuit has explained,

> The North Carolina long-arm statute provides, inter alia, for jurisdiction over any validly-served defendant who "is engaged in substantial activity within [North Carolina]," see N.C. Gen. Stat. § 1-75.4(1)d, or whose

15

act or omission gave rise to an action claiming injury to person or property in North Carolina, *see* N.C. Gen. Stat. § 1-75.4(3). Like those of many other states, North Carolina's long-arm statute is construed to extend jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause. *See Century Data Systems, Inc. v. McDonald*, 109 N.C. App. 425, 428 S.E.2d 190, 191 (1993). Thus, the dual jurisdictional requirements collapse into a single inquiry as to whether the defendant has such "minimal contacts" with the forum state that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L.Ed. 95 (1945) (citations omitted).

Christian Sci., 259 F.3d at 215 (alterations in original).

Since the Fourth Circuit decided Christian Sci., the North Carolina Supreme Court has "emphasized that the two-step process is, in fact, a two-step process, and that jurisdiction under North Carolina's long-arm statute, N.C. Gen. Stat. § 1-75.4, must first be determined." IHFC Props., LLC v. APA Mktg., Inc., 850 F. Supp. 2d 604, 616 (M.D.N.C. 2012) (citing Brown v. Ellis, 363 N.C. 360, 363, 678 S.E.2d 222, 223 (2009) (per curiam)). Schappel and Falcon Technologies do not, however, dispute that North Carolina's long-arm statute authorizes jurisdiction over them; instead, they assert that such exercise does not comport with due process. (See, e.g., Docket Entry 69 at 1-2; Docket Entry 78 at 1-2.) In any event, the facts presented satisfy North Carolina's long-arm statute, which provides for jurisdiction over a nonresident defendant where injury in North Carolina arose out of the defendant's actions outside of North Carolina, provided that at

the time of injury, "[p]roducts, materials or thing[s] processed, serviced, or manufactured by the defendant were used or consumed" in North Carolina. N.C. Gen. Stat. § 1-75.4(4); see also N.C. Gen. Stat. § 1-75.4(5)(c) (providing jurisdiction in any action arising out of defendant's promise to plaintiff to deliver within North Carolina "goods, documents of title, or other things of value"); N.C. Gen. Stat. § 1-75.4(5)(e) (authorizing jurisdiction over actions "[r]elat[ing] to goods[] . . . or other things of value actually received by the plaintiff in this State from the defendant through a carrier without regard to where delivery to the carrier occurred").

Here, Schappel created software-containing servers that allegedly infringed Epic's trademarks and copyrights and shipped those servers (via UPS Ground) to Falcon Amusement in North Carolina. (See Docket Entry 80-1 at 43, 49-58, 147; Docket Entry 80-2 at 119.) In so doing, Schappel purportedly acted on behalf of Falcon Technologies. (Docket Entry 86 at 1-5, 7; see generally Docket Entry 87.) These actions caused injury in North Carolina. See, e.g., AARP v. American Family Prepaid Legal Corp., 604 F. Supp. 2d 785, 799-801 (M.D.N.C. 2009) (concluding that North Carolina distribution of infringing materials caused harm in North Carolina). Consequently, North Carolina's long-arm statute authorizes the exercise of jurisdiction over Schappel and Falcon

Technologies.  See id. (finding jurisdiction over primary participants in distribution of infringing materials).[6]

The Court still must determine whether exercise of jurisdiction over Schappel and Falcon Technologies comports with due process.  "A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has 'minimum contacts' with the forum, such that to require the defendant to defend its interests in that state 'does not offend traditional notions of fair play and substantial justice.'" Carefirst, 334 F.3d at 397 (quoting International Shoe, 326 U.S. at 316).  To satisfy the minimum contacts test, the plaintiff must "show that the defendant 'purposefully directed his activities at the residents of the forum' and that the plaintiff's cause of action 'arise[s] out of those activities.'" Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 277 (4th Cir. 2009) (alteration in original) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)).  This test "ensure[s] that the defendant is not 'haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts,'" and thus "protects a

_____

6 "A court . . . may exercise pendent personal jurisdiction over any claim that arises out of a common nucleus of operative facts as the claim over which the court has personal jurisdiction." Pan-American Prods. & Holdings, LLC v. R.T.G. Furniture Corp., 825 F. Supp. 2d 664, 678 (M.D.N.C. 2011) (internal quotation marks omitted).  Therefore, particularly in the circumstances of this case, the undersigned deems it unnecessary to separately analyze each of Epic's and the Falcon Amusement Parties' claims.

defendant from having to defend himself in a forum where he should not have anticipated being sued." Id. (quoting Burger King, 471 U.S. at 475). Hence, in the context of this case, due process essentially asks whether Schappel and Falcon Technologies should "reasonably anticipate being haled into court" in North Carolina regarding the allegedly infringing Falcon software and its North Carolina distribution. Calder v. Jones, 465 U.S. 783, 790 (1984).

"In judging minimum contacts, a court properly focuses on the relationship among the defendant, the forum, and the litigation." Id. at 788 (internal quotation marks omitted). If, as here, the defendants' contacts with the forum give rise to the lawsuit, those contacts may provide specific jurisdiction over the defendants. Carefirst, 334 F.3d at 397. "In determining whether specific jurisdiction exists, [courts] consider (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." Id. (internal quotation marks omitted). In analyzing specific jurisdiction, a court must focus on the nature and quality of the defendants' contacts with the forum. Id. Notably, however, a court "should not 'merely . . . count the contacts and quantitatively compare this case to other preceding cases.' Even a single contact may be sufficient to

create jurisdiction when the cause of action arises out of that single contact, provided that the principle of 'fair play and substantial justice' is not thereby offended." Id. (alteration in original) (citation omitted).

## A.  **Primary Participant Jurisdictional Analysis**

Falcon Technologies and Schappel maintain that the Court lacks personal jurisdiction over them because their North Carolina contacts arose from their actions on behalf of, ultimately, DDDDB. (Docket Entry 86 at 1-5, 7; see generally Docket Entry 87.)[7]  This contention is known as the "fiduciary shield doctrine."  See Pittsburgh Terminal Corp. v. Mid Allegheny Corp., 831 F.2d 522, 525 (4th Cir. 1987).[8]  That doctrine does not apply where, as here, the

---

[7]  By contending that Schappel acted on behalf of Falcon Technologies, which purportedly "acted as a promoter on DDDDB's behalf" (Docket Entry 86 at 2), Falcon Technologies necessarily abandoned its contention of noninvolvement with North Carolina. (Compare Docket Entry 70 at 6 (Epic's "entire jurisdictional claim rests on its contention that [Falcon Technologies] 'participated' in a purported illegal software distribution scheme in North Carolina. This type of conclusory jurisdictional allegation cannot not [sic] survive a motion to dismiss."), with Docket Entry 86 at 3 ("Here, the Distribution Agreement executed by Falcon Technologies on DDDDB's behalf was clearly a reasonable means of carrying out DDDDB's corporate powers and authorized purposes: DDDDB was created for the express purpose of distributing Falcon software to Falcon Amusement, and that is precisely what the Distribution Agreement entailed.").)

[8]  Schappel and Falcon Technologies offer two versions of this contention:  (1) they acted in their official capacities in relation to their North Carolina contacts and (2) DDDDB ratified the Agreement, thereby assuming liability for it.  (See Docket Entry 78-1 at 3-4; Docket Entry 86 at 1-5, 7; see generally Docket Entry 87.)

"forum state's long-arm statute is coextensive with the full reach of due process." Id. (internal quotation marks omitted); see also Christian Sci., 259 F.3d at 215 ("North Carolina's long-arm statute is construed to extend jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause."). The question remains whether Schappel's and Falcon Technologies' actions satisfy the purposeful availment test. See Calder, 465 U.S. at 790; AARP, 604 F. Supp. 2d at 799 (explaining that a court can exercise jurisdiction over a nonresident "who is a 'primary participant[] in an alleged wrongdoing intentionally directed' at a resident in the forum state" (alteration in original)).

"The purposeful-availment test is flexible, and [the] analysis proceeds on a case-by-case basis." Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 302 (4th Cir. 2012). In the context of intentional torts, courts may assess purposeful availment through the so-called "effects test." Carefirst, 334 F.3d at 397-98 & n.7. Under this test, the plaintiff must show "that: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity." Id. at 398 n.7. Copyright infringement is an intentional tort, which causes harm in the areas of distribution.

21

See Pan-American Prods. & Holdings, LLC v. R.T.G. Furniture Corp.,
825 F. Supp. 2d 664, 684 (M.D.N.C. 2011).[9]

In the contractual context,[10] purposeful availment occurs if
"the contract has a substantial connection with the forum state.
The parties' negotiations, contemplated future consequences, the
terms of the contract, and the parties' actual course of dealing,
must be considered in determining whether the defendant
purposefully established minimum contacts in the forum state."
Tubular Textile Mach. & Compax Corp. v. Formosa Dyeing & Finishing,
Inc., No. 4:96CV00391, 1997 WL 33150812, at *4 (M.D.N.C. Jan. 29,
1997) (first citing McGee v. International Life Ins. Co., 355 U.S.
220, 223 (1957); then citing Burger King, 471 U.S. at 479).  In
this regard, it is significant if the defendant initiated the
forum-directed contractual relationship.  Pan-American, 825 F.
Supp. 2d at 682-83; see also Tubular Textile, 1997 WL 33150812, at
*5 ("It is well established that where a defendant deliberately
creates continuing obligations between itself and a forum entity,
it has availed itself of the privilege of conducting business
there, and where its 'activities are shielded by the "benefits and

---

9    Trademark infringement, Lanham Act claims, unfair
competition and passing off, fraudulent inducement, and UDTPA
claims are also intentional torts that can justify the exercise of
jurisdiction over an individual who participates in those torts on
behalf of a corporation.  See AARP, 604 F. Supp. 2d at 799-800.

10  As noted previously, the Crossclaims include a breach of
contract claim.

protections" of the forum's laws it is presumptively not unreasonable to require [it] to submit to the burdens of litigation in that forum as well." (alteration in original) (quoting <u>Burger King</u>, 471 U.S. at 475-76)).

Construed in the light most favorable to Epic and the Falcon Amusement Parties, the evidence reveals the following facts:

Schappel created Falcon Technologies and its wholly owned subsidiary, DDDDB, to distribute Falcon software. Falcon software infringes Epic's trademarks and copyrights. Schappel created DDDDB to distribute Falcon software to Falcon Amusement, a North Carolina company, for further distribution in North Carolina. Schappel approached Falcon Amusement about this distribution around April of 2014. To induce this distribution, Schappel fraudulently represented to Falcon Amusement that Falcon software was his and his colleague's original creation. Schappel negotiated an Agreement with Falcon Amusement for distribution of at least 250 Falcon-containing terminals in North Carolina within one year. On November 20, 2014, Schappel signed the Agreement, which was effective November 18, 2014. After an initial one-year term, the Agreement automatically renews for successive two-year terms. The Agreement is governed by North Carolina law and contains a mandatory North Carolina forum selection clause with accompanying consents to jurisdiction in North Carolina.

23

Using his master drive, Schappel created Falcon servers for each specific North Carolina distribution site. Schappel mailed these servers to North Carolina, either directly to the individual stores or to Falcon Amusement, for use in North Carolina. Approximately once a week, Schappel remotely accessed each server in North Carolina to determine the net profits for that server's utilization of Falcon software. After retrieving financial reports from these servers, Schappel calculated the DDDDB Group's percentage of the profits and invoiced Falcon Amusement accordingly. Invoicing and payments under the Agreement began around December 3, 2014. The public used these Falcon servers in North Carolina from November 2014 through at least the end of March 2015. Schappel created DDDDB on February 10, 2015. Prior to creating DDDDB, Schappel acted on behalf of Falcon Technologies in negotiating the Agreement, creating and distributing the servers, and calculating and collecting payments under the Agreement.

This evidence establishes that — in both the intentional tort and contractual context — Schappel and Falcon Technologies purposefully availed themselves of the privilege of conducting activities in North Carolina. To begin with, acting on behalf of Falcon Technologies, Schappel initiated and entered into an Agreement to distribute allegedly copyright-infringing software in North Carolina, and he personally created servers containing this software that he shipped to North Carolina for distribution and use

24

within North Carolina. These actions satisfy each component of the specific effects purposeful availment test. See Christian Sci., 259 F.3d at 216-17.

Moreover, the Agreement that Schappel, acting on behalf of Falcon Technologies, initiated and entered into with a North Carolina corporation: (1) is governed by North Carolina law, (2) contains a North Carolina forum selection clause with corresponding consents to jurisdiction in North Carolina,[11] and (3) governs distribution of materials in North Carolina. Furthermore, in connection with the Agreement, Schappel created the servers, shipped the servers to North Carolina, and then remotely accessed[12] the servers in North Carolina on roughly a weekly basis to determine the DDDDB Group's fees pursuant to the Agreement. As such, the Agreement has a substantial connection to North Carolina,

---

[11] The forum selection clause could itself suffice to justify the exercise of personal jurisdiction over Schappel and Falcon Technologies. See IHFC Props., 850 F. Supp. 2d at 619; CoStar Realty Info., Inc. v. Field, 612 F. Supp. 2d 660, 667-69 (D. Md. 2009); cf. Burger King, 471 U.S. at 482 n.24 ("In addition, the franchise agreement's disclaimer that the 'choice of law designation does not require that all suits concerning this Agreement be filed in Florida' reasonably should have suggested to [the defendant] that by negative implication such suits could be filed there." (emphasis in original) (citation omitted)). Under North Carolina law, consent to jurisdiction clauses (1) are generally valid and enforceable and (2) "do[] not violate the Due Process Clause." Strategic Outsourcing, Inc. v. Stacks, 176 N.C. App. 247, 251, 625 S.E.2d 800, 803 (2006).

[12] Schappel's and Falcon Technologies's failure to physically enter North Carolina does not alter this analysis. See Burger King, 471 U.S. at 476.

and Schappel and Falcon Technologies can fairly be said to have purposefully availed themselves of the privilege of conducting activities in North Carolina. See, e.g., IHFC Props., 850 F. Supp. 2d at 618-20, 622; Capstar Corp. v. Pristine Indus., Inc., 768 F. Supp. 518, 524 (W.D.N.C. 1991); see also Christian Sci, 259 F.3d at 216-17.[13]

Having satisfied the purposeful availment test, the analysis turns to the second element of the specific jurisdiction standard, i.e., whether the lawsuit arose from Schappel's and Falcon Technologies' activities directed at North Carolina. See Carefirst, 334 F.3d at 397. "The analysis here is generally not complicated." Tire Eng'g, 682 F.3d at 303. Epic's and the Falcon Amusement Parties' claims relate to Schappel's and Falcon Technologies' creation and distribution to North Carolina of allegedly copyright-infringing materials. This satisfies the second factor. See Christian Sci., 259 F.3d at 216-17; see also Tire Eng'g, 682 F.3d at 303.

The third and final element of the specific jurisdiction standard asks whether exercise of personal jurisdiction is constitutionally reasonable. See Carefirst, 334 F.3d at 397. In analyzing this factor, a court "may evaluate 'the burden on the

---

13 The Agreement's initial one-year term with automatic multiyear renewals bolsters this conclusion, as the Agreement creates more than a singular or brief connection between the DDDDB Group and North Carolina.

26

defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies.'" Christian Sci., 259 F.3d at 217 (quoting Burger King, 471 U.S. at 477). This factor "ensure[s] that jurisdictional rules are not exploited 'in such a way as to make litigation "so gravely difficult and inconvenient" that a party unfairly is at a "severe disadvantage" in comparison to his opponent.'" Id. (quoting Burger King, 471 U.S. at 478).

The exercise of personal jurisdiction over Schappel and Falcon Technologies is constitutionally reasonable. Schappel maintains that defending this action in North Carolina will be inconvenient, burdensome, and costly. (See, e.g., Docket Entry 69-1 at 5.) This generalized concern cannot defeat jurisdiction. See Burger King, 471 U.S. at 477 ("[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."). The Supreme Court long ago concluded that "because 'modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity,' it usually will not be unfair to subject him to

the burdens of litigating in another forum for disputes relating to such activity." Id. at 474 (quoting McGee, 355 U.S. at 223). Moreover, Schappel will necessarily be involved in defending this lawsuit in North Carolina because he is the only individual authorized to act on DDDDB's behalf. Any incrementally greater burden for having to also defend Falcon Technologies and himself, in his individual capacity, in North Carolina does not render North Carolina's exercise of jurisdiction over Schappel and Falcon Technologies unconstitutional. See id. at 482-84.[14] Put simply, "[a]lthough defending a lawsuit in North Carolina [i]s, without doubt, inconvenient for [Schappel and Falcon Technologies], the inconvenience [i]s not so grave as to offend constitutional due process principles." Christian Sci., 259 F.3d at 217; see also Consulting Eng'rs, 561 F.3d at 278 ("[B]ecause [the defendant's] activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." (alterations in original) (quoting Burger King, 471 U.S. at 476)).

In addition, North Carolina surely has an interest in addressing copyright and trademark infringement within its borders, Christian Sci., 259 F.3d at 218, and in assuring redress for its

---

14 Indeed, defending Schappel, Falcon Technologies, and DDDDB in one lawsuit, rather than in separate lawsuits in Texas and North Carolina, should only decrease the cost, burden, and inconvenience to the DDDDB Group.

injured resident corporation, <u>Burger King</u>, 471 U.S. at 483. <u>See</u> <u>id.</u> at 482-83 (concluding that a state has a "'legitimate interest in holding [defendant] answerable on a claim related to' the contacts he had established in that State"). Finally, resolving all claims against Schappel and Falcon Technologies in North Carolina promotes judicial efficiency and reduces the burdens on Epic, the Falcon Amusement Parties, and DDDDB. <u>See</u> <u>Christian</u> <u>Sci.</u>, 259 F.3d at 218. Thus, "exercise of specific personal jurisdiction over [Schappel and Falcon Technologies] is consistent with 'traditional notions of fair play and substantial justice.'" <u>Id.</u>

In short, Epic and the Falcon Amusement Parties have made a prima facie showing that personal jurisdiction over Schappel and Falcon Technologies exists. Therefore, the Court should deny the Rule 12(b)(2) motions.

## B. Veil Piercing Jurisdictional Analysis

Alternatively, exercise of personal jurisdiction over Schappel and Falcon Technologies is proper under a veil-piercing analysis. In conducting this analysis, this Court utilizes the test North Carolina courts would apply in determining whether to pierce the corporate veil for jurisdictional purposes. <u>See</u> <u>Mylan Labs., Inc.</u> <u>v. Akzo, N.V.</u>, 2 F.3d 56, 61 (4th Cir. 1993). Falcon Technologies and Schappel contend that Nevada's veil-piercing test applies because Falcon Technologies and DDDDB are Nevada corporations.

29

(Docket Entry 70 at 8; Docket Entry 79 at 7.)  Conversely, Epic maintains that, regardless of whether North Carolina or Nevada law applies in these circumstances, veil-piercing is proper.  (Docket Entry 80 at 12-17.)  The Court need not resolve which state's test North Carolina courts would apply because under either test, a prima facie basis for piercing the corporate veil exists.

The corporate veil may be pierced in North Carolina to "prevent fraud or to achieve equity." Strategic Outsourcing, Inc. v. Stacks, 176 N.C. App. 247, 253, 625 S.E.2d 800, 804 (2006) (quoting Glenn v. Wagner, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985)).  More specifically, North Carolina adheres to the instrumentality rule, which focuses on three elements:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and
>
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

Glenn, 313 N.C. at 454-55, 329 S.E.2d at 330.  Relevant factors in this analysis include non-compliance with corporate formalities, inadequate capitalization, complete control and dominion so that the corporation has no independent identity, "and excessive

30

fragmentation of a single enterprise into separate corporations."
Pan-American, 825 F. Supp. 2d at 687. According to the North
Carolina Supreme Court,

> [i]t is not the presence or absence of any particular
> factor that is determinative. Rather, it is a
> combination of factors which, when taken together with an
> element of injustice or abuse of corporate privilege,
> suggest that the corporate entity attacked had no
> separate mind, will or existence of its own and was
> therefore the mere instrumentality or tool of the
> dominant corporation.

Glenn, 313 N.C. at 458, 329 S.E.2d at 332 (internal quotation marks
omitted). "[T]he instrumentality rule is an equitable doctrine,"
focused "upon reality, not form." Id., 329 S.E.2d at 332.
Accordingly,

> if the affiliate is merely an agent through which the
> foreign company conducts business in a particular
> jurisdiction or its separate corporate status is formal
> only and without any semblance of individual identity,
> then the in-forum affiliate's business will be viewed as
> that of the foreign corporation and the latter will be
> said to be doing business in the jurisdiction through the
> affiliate for purposes of asserting personal
> jurisdiction.

Pan-American, 825 F. Supp. 2d at 688 (alterations and internal
quotation marks omitted). Finally, it is relevant to the veil-
piercing analysis if "all entities alleged to be separate are
nevertheless represented by the same counsel." Id. at 688-89.

Under Nevada law, "the 'essence' of the alter ego doctrine is
to 'do justice' whenever it appears that the protections provided
by the corporate form are being abused." LFC Mktg. Grp., Inc. v.
Loomis, 116 Nev. 896, 903, 8 P.3d 841, 845-46 (2000). In that

31

regard, Nevada has adopted three veil-piercing requirements: "(1) The corporation must be influenced and governed by the person asserted to be its alter ego[;] (2) There must be such unity of interest and ownership that one is inseparable from the other; and (3) The facts must be such that adherence to the fiction of separate entity would, under the circumstances, sanction a fraud or promote injustice." Lorenz v. Beltio, Ltd., 114 Nev. 795, 807, 963 P.2d 488, 496 (1998) (alteration in original) (internal quotation marks omitted). "Some factors to be considered when determining if a unity exists in an alter ego analysis include, but are not limited to, commingling of funds, undercapitalization, unauthorized diversion of funds, treatment of corporate assets as the individual's own, and failure to observe corporate formalities. No one of these factors alone is determinative to apply the alter ego doctrine." Id. at 808, 963 P.2d at 497 (citation omitted). Injustice occurs when a corporation is created or used to commit tortious activities. See DFR Apparel Co., Inc. v. Triple Seven Promotional Prods., Inc., No. 2:11-CV-01406, 2014 WL 4828874, at *3 (D. Nev. Sept. 30, 2014); Chase Bank USA, N.A. v. Dispute Resolution Arbitration Grp., No. 02:05-CV-1208, 2007 WL 1577853, at *2 (D. Nev. May 31, 2007).

Finally, both Nevada and North Carolina permit reverse veil piercing. LFC Mktg., 116 Nev. at 903-04, 8 P.3d at 846; Strategic Outsourcing, 176 N.C. App. at 254, 625 S.E.2d at 805. Under

reverse veil-piercing, the corporation bears liability for the individual's actions and obligations. Strategic Outsourcing, 176 N.C. App. at 254, 625 S.E.2d at 805.

Here, Epic and the Falcon Amusement Parties have made a prima facie showing that DDDDB and Falcon Technologies are Schappel's alter egos. Schappel exercises complete control over Falcon Technologies and DDDDB. He is admittedly the only employee of DDDDB, and there is no indication that Falcon Technologies has any other employees. He created Falcon Technologies to distribute Falcon software, but then decided that he wanted to have separate subsidiary corporations for each Falcon distribution agreement, and so he created DDDDB. In its own words, DDDDB is simply a "pass-through."

Although Schappel maintains that he has never commingled his personal funds with either organization nor treated their assets as his own, the record reflects delivery of checks made payable to DDDDB in Texas months before DDDDB's creation. Moreover, Falcon Technologies, which lacks authority to do business in Texas, does not appear to possess a bank account for receiving these funds. Pursuant to the Agreement, Schappel created and shipped to North Carolina servers containing the Falcon software. Schappel did not charge Falcon Amusement for these servers. Schappel paid for these servers, which he provided to Falcon Amusement prior to DDDDB's creation and the DDDDB Group's receipt of any money under the

33

Agreement.  Additionally, the only shipment label in the record identifies a third corporation (ISWEEPSTAKES) as the sender of this server, but shows DDDDB's office address as the mailing address. This evidence suggests commingling of assets by Schappel.[15]

Additionally, although Schappel maintains that DDDDB and Falcon Technologies follow corporate formalities, record evidence supports a contrary conclusion.  Most significantly, Schappel negotiated and entered into the Agreement on behalf of DDDDB in November 2014, but did not create DDDDB until February 2015.  The Agreement states that Schappel was authorized to execute the Agreement on DDDDB's behalf, but contains no indication that Schappel executed it in his capacity as Falcon Technologies' manager.  Moreover, although Schappel identifies himself as the sole member and manager of Falcon Technologies, the article of organization for both Falcon Technologies and DDDDB list "A. T. Mathis" as the manager of Falcon Technologies, suggesting a certain fluidity in corporate formalities.  The changing story regarding the corporation on behalf of which Schappel acted in executing and implementing the Agreement likewise undercuts the DDDDB Group's assertion of adherence to corporate formalities and separate

---

15  That Schappel created these servers in and mailed them from Texas, where neither DDDDB nor Falcon Technologies can lawfully conduct business, further supports this conclusion.

corporate existences.[16]  The DDDDB Group's representation by the
same counsel similarly militates towards an alter ego finding.
That Schappel and Falcon Technologies incorporate by reference and
rely upon DDDDB's Rule 12(b)(6) arguments heightens this alter ego
impression.  See Avanti Hearth Prods., LLC v. Janifast, Inc., No.
3:10-CV-00019, 2010 WL 3081371, at *5 (W.D.N.C. Aug. 6, 2010)
("'[J]oint representation suggests that one corporation serves as
the alter ego of another.'" (alteration in original)).

Finally, Schappel created Falcon Technologies and DDDDB to
distribute Falcon software, which allegedly infringes Epic's
copyrights and trademarks.  To secure the DDDDB distribution
Agreement, Schappel purportedly informed Falcon Amusement that the
Falcon software was his original creation, a representation that
ultimately led to a lawsuit against the Falcon Amusement Parties,
prompting their Crossclaims against DDDDB and Schappel.  Such
tortious actions satisfy the equitable aspects of North Carolina's
and Nevada's veil piercing tests.  See Raleigh Flex Owner I, LLC v.
MarketSmart Interactive, Inc., No. 1:09-CV-699, 2011 WL 923356, at
*15 (M.D.N.C. Mar. 7, 2011); Chase Bank, 2007 WL 1577853, at *2.

_____

    16  This evolution strongly supports an alter ego finding, as
it appears designed to shield the individual from liability at the
expense of a corporation (1) not named on the Agreement, (2) not
heretofore identified as a defendant in the Crossclaims, and (3)
not known to the Falcon Amusement Parties as of Frank's Deposition
in April 2015.

In sum, when viewed in the light most favorable to Epic and the Falcon Amusement Parties, the record satisfies both North Carolina's and Nevada's veil piercing tests. See, e.g., Raleigh Flex Owner, 2011 WL 923356, at *14-15; Lorenz, 114 Nev. at 807-09, 963 P.2d at 496-98; Strategic Outsourcing, 176 N.C. App. at 252-54, 625 S.E.2d at 803-05. The Court therefore may exercise jurisdiction over Schappel and Falcon Technologies as alter egos of DDDDB.

## II. Rule 12(b)(6) Challenges

The DDDDB Group also seeks dismissal of various claims in the Amended Complaint pursuant to Rule 12(b)(6). In reviewing a Rule 12(b)(6) motion to dismiss, a court must "accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff." Coleman v. Maryland Court of Appeals, 626 F.3d 187, 189 (4th Cir. 2010), aff'd sub nom., Coleman v. Court of Appeals of Md., ___ U.S. ___, 132 S. Ct. 1327 (2012). Pursuant to Rule 8(a), "a complaint must contain a short and plain statement of the claim showing that the plaintiff is entitled to relief." Luna-Reyes v. RFI Constr., LLC, 57 F. Supp. 3d 495, 501 (M.D.N.C. 2014). To survive a Rule 12(b)(6) motion, the complaint must contain sufficient factual allegations "to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To qualify as plausible, a claim needs sufficient factual

36

content to support a reasonable inference of the defendants'
liability for the alleged misconduct. <u>Id.</u> (citing <u>Twombly</u>, 550
U.S. at 556). Labels and formulaic recitations of the elements of
a claim do not suffice. <u>Id.</u> Finally, in considering a Rule
12(b)(6) motion, a court generally should not consider evidence
outside the complaint, including materials related to
jurisdictional dismissal motions. <u>See Luna-Reyes</u>, 57 F. Supp. 3d
at 502.

### A. "Shotgun" Allegations

Schappel and Falcon Technologies request dismissal of all
claims against them in the Amended Complaint for lack of
particularity. (Docket Entry 70 at 10-12.) They maintain that
"the Amended Complaint fails to allege any specific act or
omissions committed by Falcon Technologies or Schappel. Instead,
the Amended Complaint merely lumps each of the Defendants together
without identifying any particular parties." (<u>Id.</u> at 11-12.) To
the contrary, the Amended Complaint does specifically identify
Falcon Technologies and Schappel as "Distributor Defendants" who,
<u>inter alia</u>, "supplied materials, including servers" to "others,
including internet cafes," who infringed Epic's trademarks and
committed unfair competition in contravention of the Lanham Act and
common law. (Docket Entry 39 at 24, ¶ 109; <u>id.</u> at 26, ¶ 117; <u>id.</u>
at 28, ¶¶ 128-29; <u>id.</u> at 30, ¶ 139.) Such allegations clearly
distinguish the Amended Complaint from the "shotgun" pleadings in

37

the cases Schappel and Falcon Technologies cite in support of their dismissal contention.  *See, e.g., Jarosiewicz v. County of Rutherford*, No. 1:05CV211, 2005 WL 2000238, at *1 (W.D.N.C. Aug. 18, 2005) (analyzing a "Complaint[] involving eight causes of action, against five defendants, all of whom appear to be lumped into each claim," and noting that "[w]ith eight causes of action and five defendants, and two possible capacities for suit, there now exist about 40 or more possible causes of action"); *see also Luna-Reyes*, 57 F. Supp. 3d at 503 (explaining that the complaint "is unclear both as to which Defendant each of those allegations refers and which basis of [Fair Labor Standards Act] coverage should apply to each allegation," and observing that the "allegations are equally consistent with the conclusion that only one of the 'Defendants' . . . took the actions alleged in the complaint").  Accordingly, the Court should deny Falcon Technologies and Schappel's 12(b)(6) request to dismiss the Amended Complaint.[17]

---

17  Moreover, recognizing that "[d]ismissal is a drastic step," courts faced with shotgun pleadings may "convert a Rule 12(b)(6) motion to dismiss into a motion for a more definite statement under Rule 12(e)."  *Luna-Reyes*, 57 F. Supp. 3d at 504. In such circumstances, courts "will direct [the p]laintiff to timely submit a more definite statement that specifies which facts relate to which particular [d]efendant such that each [d]efendant is put on notice of the facts against it sufficiently to make an assessment of whether a legal claim is stated against that [d]efendant."  *Id.*; *accord Jarosiewicz*, 2005 WL 2000238, at *1 ("grant[ing the] plaintiff leave to amend his Complaint to clarify what claims he is attempting to assert against which defendants").
(continued...)

**B.  Copyright Preemption**

The DDDDB Group contends the Court should dismiss Epic's North Carolina conversion, trade secret misappropriation, and UDTPA claims as preempted by the Copyright Act.  (Docket Entry 67 at 1; Docket Entry 69 at 2.)  The Copyright Act exclusively governs any "rights within the general scope of copyright" law under Copyright Act Sections 102 and 103.  See 17 U.S.C. § 301(a).  Accordingly, in analyzing copyright preemption, courts evaluate whether the relevant causes of action, as defined by state law, "are being asserted to protect rights that are equivalent to the rights protected by federal copyright law."  Madison River Mgmt. Co. v. Business Mgmt. Software Corp., 351 F. Supp. 2d 436, 442 (M.D.N.C. 2005).  To do this, courts apply the "extra-element" test, which this Court has described as follows:

> [A] right which is 'equivalent to copyright' is one which is infringed by the mere act of reproduction, performance, distribution or display . . . .  If under state law the act of reproduction, performance, distribution or display, . . . will in itself infringe the state created right, then such right is preempted.  But if other elements are required, in addition to or instead of, the acts of reproduction, performance, distribution or display, in order to constitute a state created cause of action, then the right does not lie 'within the general scope of copyright,' and there is no preemption.

_____

17(...continued)
If the Court concludes that the Amended Complaint contains insufficient factual allegations against Schappel and Falcon Technologies, the Court should order Epic to provide a more definitive statement rather than dismiss the Amended Complaint.

> The extra element of the state cause of action must be one which changes the nature of the action so that it is 'qualitatively different' from a copyright infringement claim. If, however, the purported extra element of the state law claim does not make it qualitatively different from a copyright infringement claim, the state law claim is preempted. Thus, the court must examine and compare the 'constituent elements of a claim for copyright infringement and [the state law claim].' To establish copyright infringement, a party must prove ownership of a valid copyright and encroachment upon one of the exclusive rights the copyright conferred. The exclusive rights conferred by a copyright are to reproduce the copyrighted work, prepare derivative works, distribute copies of the work, and perform or display the work publicly.

Id. at 442-43 (alterations and emphasis in original) (citations omitted).

Computer programs, such as Legacy and Falcon, fall "within the general scope of copyright" law. Rosciszewski v. Arete Assocs., Inc., 1 F.3d 225, 229 (4th Cir. 1993). The determinative question thus becomes whether the rights protected by North Carolina's conversion, trade secret misappropriation, and UDTPA laws are equivalent to the rights protected by federal copyright law (i.e., to reproduce, distribute, perform or display, and prepare derivative versions of Legacy). See id.

## 1. Conversion Claim

North Carolina law defines conversion as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." Peed v. Burleson's, Inc., 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956)

(internal quotation marks omitted). "The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner . . . ." Gallimore v. Sink, 27 N.C. App. 65, 67, 218 S.E.2d 181, 183 (1975) (internal quotation marks omitted). Hence, "a state law action for conversion will not be preempted if the plaintiff can prove the extra element that the defendant unlawfully retained the physical object embodying plaintiff's work. However, [Copyright Act] § 301(a) will preempt a conversion claim where the plaintiff alleges only the unlawful retention of its intellectual property rights and not the unlawful retention of the tangible object embodying its work." Tire Eng'g, 682 F.3d at 310 (citation omitted) (quoting United States ex. rel Berge v. Board of Trs. of the Univ. of Ala., 104 F.3d 1453, 1463 (4th Cir. 1997)).

The DDDDB Group maintains that Epic has not alleged the taking of a tangible copy of its Legacy software, making preemption proper.[18]    Epic    responds    that    its    "conversion    claim

---

18  In their reply briefs, the DDDDB Group asserts that Epic's conversion claim also fails as a matter of law. Because federal preemption involves constitutional considerations, "when a party provides alternative independent state law grounds for disposing of a [claim], courts should not decide the constitutional question of preemption before considering the state law grounds." Columbia Venture, LLC v. Dewberry & Davis, LLC, 604 F.3d 824, 828 (4th Cir. 2010). Therefore, the DDDDB Group's belated state-law dismissal contentions warrant consideration. According to the DDDDB Group, Epic's conversion claim fails because the Amended Complaint does not allege that "Defendants prevented [Epic] from possessing its Legacy software" or that "Defendants wrongfully failed to return"
(continued...)

is not so limited to the conversion of intangible property."
(Docket Entry 81 at 6.) Construing the Amended Complaint's
"allegations most favorably to [it]," Epic asserts, "the Amended
Complaint alleges[] . . . that a physical copy of its software was
obtained without permission." (Docket Entry 81 at 6.) In support
of this assertion, Epic points to two paragraphs in the Amended

--------

18(...continued)
"a copy of [Epic's] Legacy software." (Docket Entry 85 at 3.)
These contentions are unavailing. The "demand-and-refusal-rule"
applies only if the defendants initially possessed the property
lawfully. Stratton v. Royal Bank of Can., 211 N.C. App. 78, 83-84,
712 S.E.2d 221, 227-28 (2011). The Amended Complaint asserts that
Defendants have illegally taken and possessed Epic's property
without Epic's consent. (Docket Entry 39 at 31, ¶ 144.) Thus, the
demand-and-refusal-rule does not apply. Furthermore, insofar as
Epic contends that Defendants have taken a copy of its Legacy
software, Defendants have prevented Epic from possessing that
Legacy copy, thereby satisfying the exclusion/alteration component
of a North Carolina conversion claim. See Springs v. Mayer Brown,
LLP, No. 3:09CV352, 2012 WL 366283, at *9 (W.D.N.C. Jan. 27, 2012).
Additionally, the DDDDB Group argues that software cannot be the
subject of a North Carolina conversion claim. Under North Carolina
law, conversion does not govern the taking of intangible interests.
See, e.g., Edmondson v. American Motorcycle Ass'n, Inc., 7 F. App'x
136, 148 (4th Cir. 2001) ("business expectancies and good will");
Norman v. Nash Johnson & Sons' Farms, Inc., 140 N.C. App. 390, 414-
15, 537 S.E.2d 248, 264 (2000) ("business opportunities and
expectancy interests"). The DDDDB Group maintains that software is
an intangible item that cannot be converted. (Docket Entry 85 at
2.) At least one federal court in North Carolina has upheld a
conversion claim for electronic computer files. Bridgetree, Inc.
v. Red F Mktg. LLC, No. 3:10-CV-00228, 2013 WL 443698, at *14-15
(W.D.N.C. Feb. 5, 2013); but see WJ Glob. LLC v. Farrell, 941 F.
Supp. 2d 688, 692-93 (E.D.N.C. 2013) (concluding, in copyright
preemption analysis, that electronic computer files are "intangible
property"). For Rule 12(b)(6) purposes, however, the Court must
construe Epic's conversion claim as encompassing the taking of a
tangible copy of its software. Hence, regardless of whether North
Carolina law would permit a conversion claim for electronic
software, the DDDDB Group's state-law dismissal contentions fail.

42

Complaint:  paragraph 144 ("Defendants have taken illegally and possessed the infringing software without the express or implied consent of Epic.") and paragraph 152 ("Upon information and belief, Defendants have misappropriated Legacy's software for its own use and distribution in violation of the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152.").  (Id.)

The Amended Complaint outlines Epic's conversion claim in paragraphs 142 through 146.  (Docket Entry 39 at 31.)  In paragraph 143, Epic asserts that "[t]he infringing software being used by Defendants is the sole and exclusive property of Epic and was not conveyed or sold to Defendants."  (Id. at 31, ¶ 143.)  This description suggests that Epic's conversion claim focuses on the Falcon software rather than a copy of the Legacy software. Moreover, although Epic's conversion claim "incorporates all foregoing paragraphs" (id. at 31, ¶ 142), the incorporation does not explicitly reach the subsequent allegation that "Defendants have misappropriated Legacy's software" (id. at 32, ¶ 152).

Nevertheless, when construed in the light most favorable to Epic, this allegation of "misappropriation of Legacy software" does encompass the taking of a physical copy of Legacy software.  In addition, Epic alleges in its conversion claim that "Defendants have exercised dominion and control over Epic's property without justification or excuse."  (Docket Entry 39 at 31, ¶ 145.) Juxtaposing this encompassing description of the converted property

43

with the Legacy software misappropriation allegation, the Amended Complaint sufficiently alleges conversion of a physical copy of Legacy software to survive the DDDDB Group's preemption contention at this stage of the litigation. See Tire Eng'g, 682 F.3d at 310 (affirming denial of Rule 50 motion "because [plaintiff] was able to 'prove the extra element that the defendant unlawfully retained the physical object embodying plaintiff's work'"); cf. Madison River, 351 F. Supp. 2d at 444-45 (dismissing as preempted conversion claims arising from remote accessing of computer programs). Accordingly, the Court should deny the DDDDB Group's motions to dismiss Epic's conversion claim.

### 2. Trade Secret Claim

In North Carolina, "[t]he owner of a trade secret shall have remedy by civil action for misappropriation of his trade secret." N.C. Gen. Stat. § 66-153. "Typically, trade secrets cases involve a two-part inquiry: first, whether the process in question is a trade secret and second, if the process is a trade secret, whether that process was misappropriated." In re Wilson, 248 B.R. 745, 749 (M.D.N.C. 2000). North Carolina law defines a trade secret as

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who

44

can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3). North Carolina further defines "misappropriation" as "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." Id. § 66-152(1). The hallmarks of trade secret cases are the information's secrecy, Avtec Sys., Inc. v. Peiffer, 21 F.3d 568, 575 (4th Cir. 1994), and its acquisition by wrongful means, Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 660 (4th Cir. 1993). These aspects of a trade secret claim provide the necessary "extra elements" to qualitatively distinguish trade secret claims from copyright claims. Id.; see also Avtec, 21 F.3d at 574 (holding Virginia trade secret claim not preempted); Comprehensive Techs. Int'l, Inc. v. Software Artisans, Inc., 3 F.3d 730, 736 n.6 (4th Cir. 1993) ("We have recently held that § 301(a) does not preempt claims for trade secret misappropriation under state law."), vacated pursuant to settlement (Sept. 30, 1993).[19]

---

19 In support of its preemption contention, the DDDDB Group maintains that district courts outside the Fourth Circuit "have dismissed misappropriation of trade secret claims related to software as preempted by the Copyright Act by examining the
(continued...)

Accordingly, the Court should deny the DDDDB Group's motions to dismiss Epic's trade secrets claim.

### 3. UDTPA Claim

In North Carolina, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful," N.C. Gen. Stat. § 75-1.1, and individuals and businesses injured by such conduct possess

---

19(...continued)
allegations on a case-by-case basis, rather than applying a rigid comparison of the elements." (Docket Entry 68 at 7; see id. at 7-8.) Regardless of what those district courts do, district courts in the Fourth Circuit must examine "the elements of the causes of action" rather than "the facts pled to prove them" when dealing with software-related misappropriation claims. Trandes, 996 F.2d at 659. The DDDDB Group also contends that the secrecy element of a trade secret claim is only relevant to whether the work comes "within the scope of the subject matter of copyright," not whether the rights protected by trade secret law "are equivalent to any exclusive rights within the scope of federal copyright." (Docket Entry 85 at 4 (internal quotation marks omitted).) To the contrary: the secrecy or lack thereof does not affect whether a work falls within the scope of copyright law. More fundamentally, however, trade secret law and copyright law protect distinct rights. As the Fourth Circuit explained,

> a claim for misappropriation of a trade secret does not require the same proof as a claim for copyright infringement. To establish the latter, a plaintiff must prove that the defendant copied its *expression*. The law of trade secrets, on the other hand, protects *ideas*, without regard for the form of expression. Thus, two computer programs may be sufficiently dissimilar on the level of expression to defeat liability for copyright infringement, but they may be sufficiently similar on a more abstract or ideational level to establish liability for trade secret misappropriation.

Comprehensive Techs., 3 F.3d at 736 n.7 (emphasis in original) (citations omitted).

46

a right of action for such injury, id. § 75-16. To prove a UDTPA claim, a plaintiff must show that the defendant (1) engaged in a "deceptive" or "unfair" practice or act, (2) in or affecting commerce, (3) that harmed the plaintiff. Dalton v. Camp, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). The Fourth Circuit has held that "[c]opyright infringement is not itself a violation of the state [Unfair and Deceptive Trade Practices] Act." Nintendo of Am., Inc. v. Aeropower Co., Ltd., 34 F.3d 246, 251 (4th Cir. 1994) (recognizing, in light of Copyright Act preemption, that "state law could not in fact make copyright infringement a violation of the [UDTPA]"). Thus, to survive a motion to dismiss, a UDTPA claim must rely on allegations other than copyright infringement. See Andrews v. Daughtry, No. 1:12-CV-00441, 2013 WL 664564, at *11 (M.D.N.C. Feb. 22, 2013); see also Nintendo, 34 F.3d at 249 (affirming determination that "sales of [trademark and copyright] infringing cartridges in North Carolina constituted violations of the [Lanham Act, Copyright Act, and UDTPA]"). Here, Epic has asserted claims for trademark infringement and trade secret misappropriation, both of which support a UDTPA claim. See Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987) (trademark infringement); Medical Staffing Network, Inc. v. Ridgway, 194 N.C. App. 649, 659-60, 670 S.E.2d 321, 329 (2009)

47

(trade secret misappropriation).[20]  Accordingly, the Copyright Act does not preempt Epic's UDTPA claim, and the Court should deny the DDDDB Group's motions to dismiss this claim.

## CONCLUSION

Epic and Falcon Amusement have made a prima facie showing that this Court possesses personal jurisdiction over Schappel and Falcon Technologies in connection with the instant dispute.  Further, the Amended Complaint contains specific allegations against Falcon Technologies and Schappel.  Finally, the DDDDB Group has not shown that the Copyright Act preempts Epic's conversion, trade secret misappropriation, and UDTPA claims.

**IT IS THEREFORE RECOMMENDED** that the DDDDB Motion (Docket Entry 67), the Falcon Technologies Motion (Docket Entry 69), and the Schappel Motion (Docket Entry 78) be denied.

December 7, 2015              /s/ L. Patrick Auld
                        **L. Patrick Auld**
                **United States Magistrate Judge**

---

20  The DDDDB Group maintains that Epic's "allegations would constitute reverse passing off, instead of passing off" because Defendants "allegedly reproduced and distributed software under the name 'Falcon,' not 'Legacy.'" (Docket Entry 85 at 7-8.)  Regardless of whether the Court deems the claim passing off or reverse passing off, use of Epic's trademarks under the Falcon label supports a UDTPA claim based on trademark infringement.  Polo Fashions, 816 F.2d at 148-49.